J. B. Wenger and Estate of Maude S. Wenger, Deceased, Joseph B. Wenger, Executor v. Commissioner.
Wenger v. Commissioner
Docket No. 34959.
United States Tax Court
1954 Tax Ct. Memo LEXIS 329; 13 T.C.M. (CCH) 24; T.C.M. (RIA) 54024; January 15, 1954
George L. *330 Weisbard, Esq., 188 W. Randolph Street, Chicago, Ill., for the petitioners. Richard D. Hobbet, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in income tax of $11,029.65 against J. B. Wenger, hereinafter called "petitioner," and his wife Maude S. Wenger, now deceased [1] and hereinafter called "decedent," for the taxable year ended December 31, 1947. The questions presented for our decision are: 1. Whether petitioner and decedent are entitled to deduct on their joint individual income tax return for 1947 an operating loss sustained by the Wenger-Decatur Trust in 1947. 2. If they are entitled to such a deduction, whether the loss was an ordinary loss or a capital loss limited by the provisions of section 117 (d) of the Internal Revenue Code. Findings of Fact Most of the facts were stipulated and they are hereby found. Petitioner and decedent resided in Cairo, Illinois. Their joint individual income tax return for the year involved was filed with the collector of internal revenue for the eighth *331 district of Illinois. During 1946 and 1947 petitioner was at all times the owner and manager of his own wholesale liquor business, and had the appropriate licenses from the Alcohol Tax Unit of the Bureau of Internal Revenue for engaging in such business. Petitioner's individual wholesale liquor business reported gross receipts of $1,156,704.87 and $2,796,606.88 in 1946 and 1947, respectively. Elizabeth Mayer, Rena G. Ferguson and Mildred H. McAboy, hereinafter called "Mayer," "Ferguson" and "McAboy," were not in any way associated with petitioner in such business, nor had they ever been associated with him in such business. On October 25, 1946, O.P.A. price controls on whiskey were removed. During 1946 petitioner learned of the possibility of sharing, to the extent of a 25 per cent interest, in the purchase of the stock of bottled liquors owned by the Decatur Sales Corporation, hereinafter sometimes called "Decatur Sales," at what seemed to him at that time to be a particularly advantageous price. Mayer, Ferguson, McAboy and petitioner had contemplated formation of a formal partnership for the purpose of acquiring the capital stock of Decatur Sales and liquidating the stock of *332 liquor thus acquired. Because Mayer and Ferguson were not Illinois residents, they could not qualify for appropriate liquor licenses under Chapter 43, Article VI, Section 2 of the Illinois Revised Statutes. On November 26, 1946 an agreement emtitled "Wenger-Decatur Trust," was entered into by petitioner, Mayer, Ferguson and McAboy, as grantors, and petitioner alone, as trustee. The agreement recited: "WHEREAS, the Grantors are presently desirous of creating a trust for the purpose of purchasing 100% of the capital stock of the Decatur Sales Corporation, an Illinois corporation, 717 North College Street, Decatur, Illinois, duly qualified under State and Federal laws as a wholesale liquor dealer, and to give into the Trustee certain powers to liquidate such investment on the most profitable basis. This trust is created only for the purpose of making and liquidating the aforesaid investment in the Decatur Sales Corporation and the duration of this trust is only for the period of time necessary to effectuate the liquidation of such investment"; * * *
On the same date each grantor contributed the sum of $35,000.00 in cash to petitioner as trustee. The beneficiaries were the grantors, *333 in equal shares. Mayer, Ferguson and McAboy were named as successor trustees, in that order. The agreement also provided that: "The Trustee shall make payments to the beneficiaries hereunder from time to time during the administration of this trust of moneys derived from the liquidation of the assets of the trust estate in equal portions or 25%. "In the event of the death or disability of any of said beneficiaries, such payment shall be made only to the administrator or executor of the estate of any deceased beneficiary or personal representative. "Payments to all beneficiaries of the trust estate, excepting minors and persons under disability, shall be made to such beneficiaries in person or upon their personal receipt, and to no one else, and no interest shall be assignable in anticipation of payment nor be liable in any way for such beneficiary's debts or obligations." The trustee was given the following powers: "1) * * * [to] make all necessary and proper applications to the appropriate Federal and State agencies for necessary authorization and permission to cause the transfer and/or sale of certain cases of alcoholic beverages which will be received in said liquidation. *334 "2) * * * to sell such goods only to duly licensed and qualified wholesale liquor dealers for cash or its equivalent. "3) * * * to apply to the Department of Revenue of the State of Illinois for refund of State stamps now affixed to the aforesaid bottles and cases of alcoholic beverages. "4) * * * to borrow money and pledge the assets of the trust as collateral, including the power to borrow money from the Grantors. "5) * * * to employ attorneys and auditors and to pay all necessary and reasonable expenses, including taxes. "6) * * * to give purchase money notes in connection with the acquisition of the aforesaid capital stock with such maturities and at such rate of interest as he may in his sole discretion deem necessary and proper. "7) * * * to do everything necessary and proper in the negotiation or assignment of the warehouse receipts covering the aforesaid cases of alcoholic beverages. "8) * * * to do everything necessary and proper in the liquidation and/or dissolution of the aforesaid corporation." On November 26, 1946 an agreement was entered into between H. Paul Tick, Florence Tick, and Jean Quentin Tick, referred to as "shareholders," and petitioner as agent *335 for himself, Mayer, Ferguson and McAboy, referred to as "Purchaser," for the sale by "shareholders" to "purchaser" of all the capital stock of Decatur Sales. Three identical notes, each in the amount of $35,000, were executed on November 26, 1946 by petitioner as duly authorized agent for himself, Mayer, Ferguson and McAboy. On the same day, the Wenger-Decatur Trust borrowed $663,280.65 from the First National Bank in St. Louis. The bank received the negotiable promissory note of the trust signed by petitioner, as trustee, and secured by all the capital stock of Decatur Sales and certain warehouse receipts. Petitioner, as trustee, then directed the First National Bank in St. Louis, by letter, to disburse the loan proceeds as follows: $229,525.00 to the selling "shareholders" and the remainder to retire bank notes owed by Decatur Sales. H. Paul Tick, Florence Tick and Jean Quentin Tick received $474,525.00 for all the capital stock of Decatur Sales. This amount came from the following sources: From the $35,000 individual con-
tributions to the Wenger-Deca-
tur Trust by the four grantors
$140,000.00
The three notes for $35,000 each
105,000.00
From the bank loan
229,525.00
Total
$474,525.00
*336 The capital stock of Decatur Sales was endorsed to petitioner, as trustee of the Wenger-Decatur Trust. All of the above transactions occurred simultaneously on November 26, 1946 as integral steps of one complete transaction. On November 27, 1946 a joint shareholder's and directors' meeting of Decatur Sales was held and a resolution was passed covering the dissolution and liquidation of that corporation. The minutes of that meeting recited that petitioner was the duly elected and qualified president of Decatur Sales, that petitioner was the sole shareholder, that petitioner, McAboy and Mayer constituted the board of directors, and that petitioner and McAboy acted as chairman and secretary, respectively, of the meeting. Form 966, together with a copy of the resolution for liquidation and dissolution, was filed with the Treasury Department as required by section 148 (d) of the Internal Revenue Code. On the same day, title to 14,564-47/48 cases of liquor was transferred from Decatur Sales to petitioner, as trustee of the Wenger-Decatur Trust. The stock of liquor acquired by the Wenger-Decatur Trust consisted of 14,564-47/48 cases and 153 barrels of various distilled *337 spirits, including 55 different brands in 6 varieties of sizes. The financial statements of the Wenger-Decatur Trust for the period November 27 to December 31, 1946 and the year ended December 31, 1947 showed the following inventories in computing the cost of goods sold: November 27, 1946
$895,618.74
December 31, 1946
803,064.90
December 31, 1947 The Alcohol Tax Unit, upon being appraised of the existence and purpose of the Wenger-Decatur Trust, advised that no basic permit was required of the trust under section 3 of the Federal Alcohol Administration Act. The Wenger-Decatur Trust was not incorporated under the laws of any state. It had no corporate minute book, no corporate seal, and no corporate board of directors. It issued no shares of stock. In the regular course of his individual wholesale liquor business, petitioner would receive orders for case lots of bottled liquors of various kinds. Some of such orders were filled by petitioner from his own individual stock of bottled liquors and some were filled from the bottled liquors owned by the Wenger-Decatur Trust. When the orders were filled from liquors owned by the trust, petitioner would remit to the *338 First National Bank in St. Louis money in part payment of the note held by said bank and request that the bank release certain warehouse receipts held as collateral for such note. When such release was executed, petitioner would transfer the bottled liquors which had been freed of the bank's lien to his place of business, would deliver them to the customer who had ordered such liquors, along with whatever else he had ordered, and would receive payment therefor. The purchaser would not be aware of the source of the bottled liquors which he had purchased but would know only that he got them from petitioner, supposedly in the regular course of petitioner's individual wholesale liquor business. From the purchaser's payment, petitioner would retain 25 cents per case and remit the balance to the Wenger-Decatur Trust. This 25 cents per case was recorded in the books and records of the Wenger-Decatur Trust as "Brokerage." The Wenger-Decatur Trust made entires in its "Wholesale-Liquor-Dealers' Record," which it was required to file with the Alcohol Tax Unit, showing that transfers were made of the bottled liquors from the Wenger-Decatur Trust to petitioner as an individual. Petitioner then *339 made entires in his record showing that transfers were made from petitioner as an individual to the purchasers. All financing arrangements were of short duration, all notes being payable on or before December 9, 1947, and having been actually paid in full by November 24, 1947. On June 9, 1947 the Wenger-Decatur Trust gave its note to the First National Bank in St. Louis for $467,887.31. The recorded number of payments thereon were: Month
Payments
June
5
July
9
August
17
September
12
October
11
November
9
Total
63 The books, records and financial statements of the Wenger-Decatur Trust indicate that it made no purchases other than the original purchase, had no place of business, paid no rent other than the warehouse storage charges on the liquor, had no furniture and fixtures, and did not itself advertise for sale any of its liquors. For 1946, the fiduciary income tax return filed by petitioner for the Wenger-Decatur Trust showed the following: Profit from trade or business: Sales
$122,567.95
Inventory, 11/27/46
$895,618.74
Freight paid
217.91
$895,836.65
Less inventory,
12/31/46
803,064.90
92,771.75
GROSS PROFIT
$ 29,796.20
Expenses: Interest
$ 1,570.97
Storage
766.80
License and bond
240.51
Professional
237.05
Office and misc.
647.67
3,463.00
NET INCOME
$ 26,333.20
*340 On their joint Federal income tax return for 1946, petitioner and decedent reported as ordinary income the sum of $6,583.30, which they considered to be undistributed income from the Wenger-Decatur Trust. In the last three months of 1946 business was good for the wholesale whiskey industry. Financing whiskey inventories was easy because banks looked favorably upon the whiskey business at that time. During the early part of 1947 buying fell off. In March whiskey prices started falling. The whiskey business was generally poor during the first six months of 1947. The banks became concerned as to their collateral. In July of 1947, the price structure dropped repeatedly. Toward the end of 1947 buying became a little firmer, but prices did not increase substantially. Banks were skeptical about the whiskey business all during 1947. In the last quarter of 1947 banks wanted more collateral or the notes paid up. The loan by the First National Bank in St. Louis made to the Wenger-Decatur Trust on November 26, 1946 bore interest at 2 1/2 per cent per annum. The bank's loan of June 9, 1947 was made at 3 per cent interest. For the year 1947, the fiduciary income tax return filed by petitioner *341 for the Wenger-Decatur Trust showed the following: Profit from business: Sales
$727,121.05
Inventory, 1/1/47
$803,064.90
Freight
1,703.32
$804,768.22
Less inventory,
12/31/47
0
804,768.22
GROSS LOSS
$ 77,647.17
Expenses: Interest
$ 10,947.21
Storage
5,336.05
Brokerage
2,876.75
Insurance
2,611.60
Professional
799.44
Office and misc.
1,142.15
23,713.20
NET LOSS
$101,360.37 In 1947 the Wenger-Decatur Trust made 118 sales, as follows: January
7
February
7
March
7
April
6
May
4
June
9
July
18
August
17
September
16
October
11
November
14
December
2 On November 20, 1947 one sale was recorded in the amount of $60,000.00, the payment being recorded by the trust as an account receivable due from petitioner. The December 31, 1947 balance sheet of the Wenger-Decatur Trust consisted of: Assets: Cash in bank
$ 5,326.29
Account receivable from
J. B. Wenger
60,000.00
TOTAL ASSETS
$65,326.29
Liabilities and Trust Equities: Loans payable to grantors
$ 353.46
Trust equities
64,972.83
TOTAL LIABILITIES AND
TRUST EQUITIES
$65,326.29 On their joint 1947 Federal income tax *342 return petitioner and decedent reported an ordinary loss from the Wenger-Decatur Trust in the amount of $25,340.09, which was computed as follows: (a) In 1946 petitioner contributed
to the principal of the Wenger-Deca-
tur Trust the sum of
$35,000.00
(b) Petitioner reported on his 1946
income tax return his share of what
was considered by him to be undis-
tributed income of the trust for the
year 1946 in the amount of
6,583.30
(c) Petitioner considered his total
cost of participation in the trust to
be the sum of (a) and (b)
$41,583.30
(d) Petitioner's share of the net
trust equity as of December 31, 1947
was
16,243.21
(e) Petitioner considered his loss
in 1947 to be the difference between
(c) and (d)
$25,340.09
Tin income tax returns of the Wenger-Decatur Trust were at all times filed on a trust theory. The income tax returns of petitioner and decedent for the years 1946 and 1947 reported gains and losses of the Wenger-Decatur Trust as income or losses from a trust. The account receivable of the Wenger-Decatur Trust from petitioner in the amount of $60,000 was not paid by petitioner until some time after December 31, 1947. Early in 1948 petitioner *343 as trustee of the Wenger-Decatur Trust made his final accounting to Mayer, Ferguson and McAboy. The Wenger-Decatur Trust thereupon distributed to each of them and to petitioner his or her individual share of the trust equities, being $16,243.21 less one-fourth of the audit expense. In the deficiency notice addressed to petitioner and decedent, respondent stated: "(a) The loss from the Wenger-Decatur Trust, $25,340.09, which you reported, and deducted from your other income on your amended return, is held not to be an allowable deduction to you as a beneficiary of the trust." Respondent also sent to petitioner and decedent a copy of the revenue agent's report wherein it was held "that this trust is an association taxable as a corporation." The Wenger-Decatur Trust was not a partnership. It was in substance an association taxable as a corporation. Opinion That petitioner and his associates were not partners or joint venturers as petitioner primarily contends seems to us clear from the evidence. In fact only one characteristic of a partnership seems to be present. The participants were entitled eventually to share in the profits of the trust. But that is an element common *344 to other types of business organizations including true trusts and corporations. The other beneficiaries apparently relinquished their right to control the actions of the trustee and accordingly would be free of personal liability under the applicable Illinois law. Schumann-Heink v. Folsom, 328 Ill. 321, 159 N.E. 250; Levy v. Nellis, 284 Ill. App. 228, 1 N.E. 2d 251; cf. Piff v. Berresheim, 405 Ill. 617, 92 N.E. (2d) 113. There would thus be no sharing of losses beyond the amount originally contributed. The enterprise would have to continue in spite of the death or attempted withdrawal of one of the participants. Petitioner filed income tax returns as a fiduciary and computed the tax of the enterprise accordingly. And had this been a joint venture or mere agency it seems highly questionable whether the parties could legally have participated in the sale of liquor which was the trust's sole purpose since the beneficiaries who were not residents of Illinois were forbidden to engage in that business. [2] It is perhaps for this reason that the parties throughout appear to have dealt with the operation only as a business trust. And having chosen the *345 benefits of that form they should not now be heard to deny it. Interstate Transit Lines v. Commissioner, 319 U.S. 590. It will thus be seen that far from stimulating a partnership the Wenger-Decatur Trust conformed in virtually every respect to the tests for describing it as an association taxable as a corporation. Morrissey v. Commissioner, 296 U.S. 344. Centralized management, continuity of existence, and the location of title to the property embarked in the enterprise, as enumerated in the Morrissey case, were all clearly present. We have already concluded that limitation of personal liability was achieved by the delegation of responsibility to the trustee. Whether the final element of ease of transferability of beneficial interests was also present is not entirely clear. The trust instrument in terms purports to limit the assignability of the shares in the enterprise. But there is doubt whether this could be *346 effectively accomplished with respect to the beneficial rights of participants who were at the same time grantors. Restatement, Trusts (1935) sec. 156, comment e.[3] But even assuming the absence of this one element there would still be sufficient similarity to a corporation to warrant the conclusion that the form adopted was more similar to a corporation than to a trust. Reinecke v. Kaempfer, (C.A. 7) 72 Fed. (2d) 469, certiorari denied 294 U.S. 708. Sears, Roebuck & Co. Employees' Savings, Etc. v. Commissioner, (C.A. 7) 45 Fed. (2d) 506. As to petitioner's final suggestion that the trust was not engaged in business but consisted merely of a liquidating operation, cf. Helvering v. Washburn, (C.A. 8) 99 Fed. (2d) 478, it suffices to observe that since the property was acquired for the purpose of resale the only resemblance to a liquidation was that no further ventures of a similar *347 or continuing nature seem to have been anticipated. But that is not fatal to the carrying on of a business. Helvering v. Combs, 296 U.S. 265 [365]; Commissioner v. Highlands E.-L. Subd., Etc., (C.A. 7) 88 Fed. (2d) 355, certiorari denied 302 U.S. 691; Huron River Syndicate, 44 B.T.A. 859. Petitioner himself adequately disposes of the point when, in contending that the loss was ordinary rather than capital in nature, he points to the fact that the property acquired was held for sale in the ordinary course of business. And at another point insists that "The evidence * * * clearly shows the * * * intention of the parties to join together for the purpose of operating as partners the business * * * (Italics supplied.)" Here, as in the Morrissey case, supra, (p. 360), "* * * we are considering those trusts which have the distinctive feature of being created to enable the participants to carry on a business and divide the gains which accrue from their common undertaking, trusts that thus satisfy the primary conception of association and have the attributes to which we have referred, distinguishing them from partnerships." Having *348 determined that the trust was comparable to a corporation for tax purposes it follows that petitioner could not deduct any part of its losses. See Watson v. Commissioner, (C.A. 2) 124 Fed. (2d) 437. And it becomes unnecessary to consider whether if it were a true trust the provisions of section 166, Internal Revenue Code, would be applicable and thus enable a beneficiary to report the loss. Cf. Theron E. Catlin, 25 B.T.A. 834. Decision will be entered for the respondent. Footnotes
1. The Estate of Maude S. Wenger was substituted as petitioner.↩
2. The parties stipulated that "Elizabeth Mayer and Rena Ferguson were not residents of the State of Illinois and could not qualify for appropriate liquor licenses under Chapter 43, Article VI, Section 2 of the Illinois Revised Statutes."↩
3. If a person attempts to create a spendthrift trust for his own benefit, he may voluntarily transfer his interest although the terms of the trust contain an express restraint against his voluntary alienation. [Restatement, Trusts, supra.]↩